**SEARS, ROEBUCK AND COMPANY,
Appellant,**

v.

**Willie Mae NICHOLS and Bill
Nichols, Appellees.**

**No. B14–90–00965–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

Oct. 24, 1991.

Rehearing Denied Dec. 19, 1991.

Rick Gibson, Houston, for appellant.

Gary Bowers, Humble, for appellees.

Before MURPHY, ELLIS and MORSE (Sitting by Designation), JJ.

## OPINION

ELLIS, Justice.

This is a Deceptive Trade Practices–Consumer Protection Act (DTPA) implied warranty case. Appellees sued Sears, Roebuck and Company (Sears) for personal injury damages allegedly resulting from repairs to the appellees' riding lawn mower. Appellees alleged that Sears was negligent and breached the implied warranty to repair or modify existing tangible goods or

property in a good and workmanlike manner, constituting a violation of the DTPA. TEX.BUS. & COM.CODE ANN. § 17.41 et seq. Following a non-jury trial, the trial court entered judgment in favor of appellees finding that Sears had been negligent and had breached the implied warranty to repair in a good and workmanlike manner. The trial court awarded the appellees actual damages, additional damages for a knowing violation under the DTPA, attorney's fees, and prejudgment and post-judgment interest. We reverse and render judgment for Sears.

In June 1987, appellee Willie Mae Nichols took the family riding lawn mower to Sears' East Little York Service Center, Houston, Texas, for repairs. Sears informed Mrs. Nichols that the mower needed replacement motor mounts. After receiving information concerning the cost of the repairs, Mrs. Nichols instructed Sears to make the repairs. When Mrs. Nichols returned home and told her husband Bill Nichols she had authorized repairs to the motor mounts, he stated: "You want to pay the labor to Sears when we could put on the motor mounts?" During his testimony Mr. Nichols stated he had maintained and serviced the mower since it was purchased and he believed he could save money by doing the repair work himself. In fact, the evidence showed that Mr. Nichols and his son had replaced the engine on the mower in June of 1986, and had purchased a belt from an auto parts store and placed it on the mower after a second trip to the auto parts store to find the correct belt to fit the mower.

Once Mrs. Nichols left the mower with Sears to be repaired it was assigned to technician Kenneth King. During the course of his work, Mr. King determined that the transmission belt on the mower, the one previously replaced by Mr. Nichols, would not properly fit the mower after the authorized repairs were completed. Knowing that the estimate given to Mrs. Nichols for the repairs did not include a new belt and labor costs for replacing that belt, Mr. King telephoned appellees. Mr. King spoke to Mr. Nichols and attempted to obtain authorization to replace the transmission belt. Mr. King told Mr. Nichols that the belt would not fit the mower after the repairs, because the belt was too small, and as a result the mower would not operate properly because the old belt would not allow the mower to shift properly and would not disengage the transmission. Mr. King was aware from the paperwork on the mower that Mr. Nichols had previously replaced the mower's engine. Having been informed that further repairs were necessary for the mower to operate properly, Mr. Nichols disregarded Mr. King's warning and stated: "Leave that damn belt alone. I just bought it at an auto supply." After being told again that the mower was not going to work properly Mr. Nichols told Mr. King to leave the belt alone.

After the telephone conversation with Mr. Nichols, Mr. King completed the authorized repairs and wrote on the service order "Trans Belt Will Not Disengauge [sic]." Sears notified appellees that the mower could be picked up. Mrs. Nichols told her husband that she was going to pick up the mower. Mrs. Nichols took her son with her to pick up the mower. When Mrs. Nichols arrived at Sears she received a copy of the service order which contained the above quoted notation. Mrs. Nichols and her son took the mower home and unloaded it. Mrs. Nichols stood approximately five feet in front of the mower as her son started it. When the son tried to put the mower into reverse, the gear would not engage; he then tried to put the mower into a forward gear. The mower moved forward toward Mrs. Nichols. Once in motion, the mower would not stop when the clutch was depressed because the transmission belt was too small and would not disengage the transmission. The mower struck Mrs. Nichols, pinning her between the mower and the Nichols' pick-up truck. As a result of the accident, Mrs. Nichols required medical treatment, including arthroscopic knee surgery, and will require further medical treatment. The Nichols' brought suit against Sears for the personal injuries resulting from this accident. On July 10, 1990, the trial court signed a Final Judgment awarding $42,800 to Willie Mae

Nichols, $10,000 to Bill Nichols, $13,200 in additional DTPA damages based on a knowing violation[1], $21,120 in attorney's fees, $8,311.88 in prejudgment and post-judgment interest. Sears requested findings of fact and conclusions of law and now brings this appeal.

In its first point of error Sears alleges that the trial court erred as a matter of law in concluding that Sears had breached the implied warranty to repair in a good and workmanlike manner.

■ Conclusions of law are always reviewable by an appellate court. *Middleton v. Kawasaki Steel Corp.*, 687 S.W.2d 42, 44 (Tex.App.—Houston [14th Dist.] 1985, *writ ref'd n.r.e. per curiam*, 699 S.W.2d 199 (Tex.1985). Although a trial court's conclusions of law may not be challenged for factual insufficiency, the conclusions of law drawn from the facts may be reviewed to determine their correctness when a statement of facts is filed with the trial court's findings of facts and conclusions of law. *Mercer v. Bludworth*, 715 S.W.2d 693, 697 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). Conclusions of law must be attacked as erroneous as a matter of law. *Id.* Incorrect conclusions of law will not require a reversal, however, if the controlling findings of fact will support a correct legal theory. *Valencia v. Garza*, 765 S.W.2d 893, 898 (Tex.App.—San Antonio 1989, no writ).

Appellant argues the trial court erred as a matter of law in finding that it breached the implied warranty to repair in a good and workmanlike manner. Appellant contends that a finding of breach of the implied warranty on the facts of this case is unnecessary and unjustified. We agree.

■ In 1987, the Texas Supreme Court held that the sale and furnishing of a service carries with it the *implied warranty* that the service will be performed in a skillful and workmanlike manner and that the breach of this warranty is actionable under the DTPA. *Melody Home Mfg. Co.*

*v. Barnes*, 741 S.W.2d 349, 354 (Tex.1987). In reaching this conclusion, the Court noted that the United States has shifted from a goods to a services oriented economy, and that with this change there has resulted a marked decrease in the quality of services. *Id.* at 353. The Court stated that such problems led the court and the legislature to apply the implied warranty theory to products, goods, and new houses. *Id.* citing *Humber v. Morton*, 426 S.W.2d 554, 562 (Tex.1968) (new houses); *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787, 789 (Tex.1967) (products); *Jacob E. Decker & Sons v. Capps*, 139 Tex. 609, 164 S.W.2d 828, 832 (1942) (food sales). The Court reasoned that certain public policies favored the extension of the implied warranty theory to service transactions. The Court looked to Professor Prosser and his article, *The Assault Upon the Citadel*, 69 Yale L.J. 1099, 1120–24 (1960), and determined that four policy concerns justified the extension of the implied warranty to services:

1. The public interest in protecting consumers from inferior services is paramount to any monetary damages imposed upon sellers who breach an implied warranty.

2. A service provider is in a much better position to prevent loss than is the consumer of the service. Many services are so complicated that a consumer is unable to independently determine quality and must depend on the experience, skill, and expertise of the service provider.

3. A consumer should be able to rely upon the expertise of the service provider. The application of an implied warranty to services would encourage justifiable reliance on the service providers who would have more incentive to increase and maintain the quality of the services they provide.

4. A service provider is better able to absorb the cost of damages associated with inferior services through insurance

---

1. This amount constitutes twenty-five percent (25%) of the actual damages awarded to Mrs. Nichols. The court, in its findings of fact, stated that in arriving at this figure it took into

account Mr. Nichols' disregard of the warning given by Sears' technician Kenneth King regarding the effect of not replacing the transmission belt.

and price manipulation than is the individual consumer.

*Melody Home,* 741 S.W.2d at 353–54. The Court noted that the question was one of protecting the helpless consumer, the consumer who takes what he gets because he does not know enough technically to test and judge what is before his eyes. *Id.* at 353 n. 6, *quoting* Llewellyn, *On Warranty of Quality and Society: II,* 37 Colum.L.Rev. 341, 404 (1937). The caveat emptor rule as applied to services such as repairs is an anachronism out of line with modern service buying practices. *Melody Home,* 741 S.W.2d at 354. The "buyer beware" rule does a disservice to the prudent purchaser and to the industry by encouraging shoddy workmanship. *Id.*

In *Melody Home,* Mr. and Mrs. Barnes ordered a pre-fabricated home from Melody Home. After the couple moved in, they had puddles and dampness inside the house. They eventually discovered that a sink was not connected to the drain in one of the interior walls. The leak caused damage to the sheetrock, insulation, and flooring. The couple contacted Melody Home who sent out repairmen. The efforts of the repairmen failed and additional damages were caused by the shoddy repair work. The Barneses filed suit under the DTPA and the jury found that Melody Home had failed to construct the home in a good and workmanlike manner and that Melody Home had breached the implied warranty to repair in a good and workmanlike manner.

▆▆▆ The facts of the *Melody Home* case and the issue presented in that case are different from those before us today. The issue presented in *Melody Home* was whether the protection of Texas consumers required an implied warranty that repair services of existing tangible goods or property would be performed in a good and workmanlike manner as a matter of public policy. *Id.* at 353. The issue raised in this appeal is apparently a novel one in Texas. The question presented is whether an implied warranty to perform services, specifically repairs, in a good and workmanlike manner has been breached when a repair-

man, after explaining to a knowledgeable customer the need for the repairs and the consequences of failing to make the repairs, follows the customer's instruction not to make the suggested repairs.

The service purchasers in *Melody Home,* the Barneses, were unknowledgeable and relied completely on the experience and skill of the Melody Home repairmen. The Barneses had insufficient knowledge and experience to judge whether the repairs were adequately performed. They justifiably relied on the service providers and were rewarded with inferior services. The relevant facts in this case establish that: Bill Nichols had considerable experience in servicing and repairing the mower, to the extent of replacing the engine; Bill Nichols had purchased a transmission belt from an auto parts store and was aware that the mower needed a certain size belt to operate properly; Sears technician Kenneth King realized that the existing transmission belt was too small after the authorized repairs were completed; Mr. King called Mr. Nichols to obtain permission to replace the transmission belt; Mr. King explained that the old belt did not fit the mower and as a result, the mower would not operate properly because the old belt would not disengage the transmission; Mr. King was aware that Mr. Nichols had previously replaced the engine in the mower and that Mr. Nichols was knowledgeable about the service and operation of the mower; Bill Nichols twice instructed Mr. King to leave the belt alone; Mr. King completed the authorized repairs but otherwise followed Mr. Nichols instructions to leave the belt alone; Sears informed the Nichols that the repairs had been completed and that the mower could be picked up; and Mrs. Nichols told her husband that she was going to pick up the mower.

The trial court's finding that Sears breached the implied warranty in this case is unjustified. We decline to extend the *Melody Home* warranty to a case where the service provider attempted to obtain authorization for necessary repairs, explaining the consequences of failing to make those repairs, and, only at the knowl-

edgeable customer's insistence, refrained from doing so. To do otherwise would serve none of the policies enunciated and relied on by the Court in *Melody Home.* The Court in *Melody Home* first stated that protecting consumers from inferior services is paramount. This case is not about inferior services. It is undisputed that the authorized repairs, the replacement of the motor mounts, were adequately performed. This case concerns refraining from performing services at the insistence of a knowledgeable customer armed with the necessary facts. The action taken by Sears, calling the customer to obtain permission for further repairs so as to avoid potential damage or injury, is a prudent course of conduct.

Second, the Court stated that the service provider is in a better position to prevent loss because many services are so complicated that a consumer must rely on the experience and the skill of the repairman. But in this case such a disparity in knowledge about the repair did not exist. Mr. Nichols had performed major repairs on the mower and knew that a certain sized belt was necessary for the proper performance of the mower. Further, Mr. Nichols was informed of the consequences of failing to replace the old transmission belt by Mr. King who knew that Mr. Nichols had previously performed repairs on the mower. Here, the customer refused to rely upon the expertise and skill of the service provider when it was offered. The Supreme Court also reasoned that the application of an implied warranty would encourage justifiable reliance on the repairman and give the repairman an incentive to increase and maintain the quality of his work. The facts of this case show that it was the customer's refusal to rely on the advice of the service provider that led to the damages sustained in this case. The trial court specifically found that Mr. Nichols had disregarded the warning given by the Sears' technician. Sears did not blindly accept Mr. Nichols' instruction, but followed the request of Mr. Nichols only after

fully explaining the potential problems to him. The Supreme Court's discussion of this third policy reason obviously assumes that the consumer would rely upon the advice and skill of the service provider, an assumption that is not present in this case. Finally, the Supreme Court stated that the service provider is better able to absorb the cost of damages associated with inferior services. Again, this case does not deal with inferior services, rather it deals with a repairman following a customer's instructions regarding additional services.

Extending the *Melody Home* warranty under these facts would encourage the performance of unauthorized repairs without consultation with the customer[2], encourage disregard of the customer's instructions, or encourage repairmen to remain silent when they discovered a potential problem for fear the customer would refuse the additional work creating liability for the service provider. DTPA cases generally involve some type of deception, overreaching, or taking unfair advantage of a customer. *See e.g., Chastain v. Koonce,* 700 S.W.2d 579, 584 (Tex.1985); *Pfeiffer v. Ebby Halliday Real Estate, Inc.,* 747 S.W.2d 887, 891 (Tex.App.—Dallas 1988, no writ); *Southwest Lincoln–Mercury, Inc. v. Ross,* 580 S.W.2d 2, 5 (Tex.Civ.App.—Houston [1st Dist.] 1979, no writ). There was no deception, overreaching, or taking unfair advantage in this case. Nor were there repeated, failed repair attempts that caused additional damage as in *Melody Home.*

Hindsight suggests that perhaps Sears should have removed the old belt and left it off. But the question here is not whether Sears should have taken another course of action nor is it whether Sears released the mower in an unsafe and dangerous condition as suggested by the trial court. The question presented is whether Sears breached the implied warranty to repair in a good and workmanlike manner.

The Texas Supreme Court defined good and workmanlike as "that quality of work

---

**2.** Ironically, if Sears had done the additional repairs and charged for those repairs without consulting the customer, it would have committed a DTPA violation. *Hyder–Ingram Chevrolet, Inc. v. Kutach,* 612 S.W.2d 687, 688 (Tex.Civ. App.—Houston [14th Dist.] 1981, no writ).

performed by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work." *Melody Home*, 741 S.W.2d at 354. The Court held that this does not require repairmen to guarantee the *results* of their work, but only requires those who repair or modify existing tangible goods or property to *perform* those services in a good and workmanlike manner. *Id.* at 355 (Emphasis in the original). The relevant inquiry in a breach of the implied warranty to repair in a good and workmanlike manner action concerns the performance of the service provider. *Id.* n. 8.

Sears performed the authorized work in a proficient manner. This is undisputed. The only question is whether there was something more required of Sears. Sears' practice of calling customers to inform them of additional work that needs to be done is commendable. But once Sears informs a customer that additional repairs are necessary and explains to the customer the consequences of failing to make the additional repairs, the final decision belongs to the customer, not to the service provider. We cannot force a service provider to do what the customer tells it to refrain from doing. The services provided by Sears to the Nichols, the repair work and the advice, meets the performance requirements imposed by the phrase "good and workmanlike."

That Mrs. Nichols, who picked up the mower, was never orally informed of the problems created by her husband's refusal to authorize the additional repairs is of no consequence. The service technician noted on the service order that the transmission belt would not disengage. Also, Mrs. Nichols told her husband that she was going to pick up the mower. Mr. Nichols knew that the mower was not going to operate properly, that the transmission belt was not going to disengage the transmission. It would put an impossible burden on a service provider to require him to contact and inform every person who might use the repaired item that its operation has been flawed because necessary repairs were declined.

While we have not found a Texas appellate court case addressing this situation, the Idaho Supreme Court has dealt with a similar situation. In *Barber v. Honorof*, 116 Idaho 767, 780 P.2d 89 (1989), the Idaho Supreme Court affirmed a finding that following a customer's instructions, which resulted in damage, did not constitute a failure to act in a good and workmanlike manner in violation of the Idaho Consumer Protection Act.

In Barber, a contractor sued a customer to recover for work done in laying a concrete driveway. *Id.* 780 P.2d at 90. The customer counterclaimed alleging the contractor's action in pouring and finishing the concrete in bad weather, which caused the concrete to break up, was a failure to perform in a good and workmanlike fashion. *Id.* In its findings of fact, the trial court found that the contractor was instructed by the customer to continue work on the driveway despite the service provider's warning to the customer of the potential effects of inclement weather on the concrete. *Id.* 780 P.2d at 92. The trial court also found that the customer knew that there was a risk of substandard results, yet instructed the contractor to proceed anyway. *Id.* The Idaho Supreme Court agreed with these findings and affirmed the appellate court decision in favor of the contractor. *Id.*

The *Barber* case adopts the view that a customer cannot ignore the advice offered by the service provider and then recover from that service provider for damages resulting from the service provider's adherence to the customer's wishes. This view is logical and compelling. To find a service provider liable after a customer instructs him not to do the work would bring about a bizarre result.

We hold that the trial court erred as a matter of law in concluding Sears breached the implied warranty to repair in a good and workmanlike manner. Appellant's first point of error is sustained.

In its second point of error Sears alleges that the trial court erred as a matter of law in concluding that Sears was negligent.

 The Texas Supreme Court has stated that there is no discernible difference in a claim of failure to perform in a good and workmanlike manner and a claim of negligent performance. *Coulson v. Lake L.B.J. Municipal Utility Dist.*, 734 S.W.2d 649, 651 (Tex.1987). It would be incongruous to hold that Sears, with the knowledge, training and experience necessary for the successful practice of its trade, had performed the repairs in a manner considered proficient by those capable of judging such work, and then hold that Sears had been negligent. If this had been a jury trial with negligence being defined for the jury, it would have been defined as the failure to do that which a mower repairman of ordinary prudence engaged in the repair of riding lawn mowers would have done under the same or similar circumstances or doing that which such a repairman would not have done under the same or similar circumstances. *See Coulson*, 734 S.W.2d at 651. Thus, it is clear that the definitions of good and workmanlike and negligence ask the same question in this case. Therefore, since we held that as a matter of law Sears did not breach the implied warranty to repair in a good and workmanlike manner, we also hold that as a matter of law Sears was not negligent. Appellant's second point of error is sustained.

Sears alleges, in its third and fourth points of error, that the evidence is legally and factually insufficient to support the trial court's conclusions that Sears violated the DTPA and was negligent. It is unnecessary to review these two points of error because we have sustained appellant's first and second points of error.

In its fifth point of error Sears contends that the trial court erred in awarding additional DTPA damages for a knowing violation. The trial court found that Sears' conduct, which established the breach of the implied warranty, was committed knowingly, justifying additional damages under the DTPA. Since Sears did not breach the implied warranty there is no

DTPA violation upon which to base the award of additional damages. Therefore, the award of additional damages is error. *See* TEX.BUS. & COM.CODE ANN. § 17.50(b) (Vernon Supp.1991) (only a consumer who prevails may recover additional damages in a DTPA action).

Appellant's sixth and seventh points of error concern the trial court's failure to find Bill Nichols negligent and to reduce the consequential damages accordingly. As a result of this court's sustaining appellant's first and second points of error, it is unnecessary to review these points.

In response to appellant's first seven points of error, appellees allege that Sears has waived these points. Appellees argue that points of error one through seven hinge on the negligence of Bill Nichols. Appellees contend the findings of fact and conclusions of law contain no findings of negligence by Bill Nichols. Therefore, appellees argue that under TEX.R.CIV.P. 299 the points of error are waived.

Rule 299 of the Texas Rules of Civil Procedure provides, in pertinent part:

Where findings of fact are filed by the trial court they shall form the basis of the judgment upon all grounds of recovery and of defense embraced therein. The judgment may not be supported upon appeal by a presumption of finding upon any ground of recovery or defense, no element of which has been found by the trial court.

 Thus, a party asserting an affirmative defense in a trial before the court must request findings in support of such a defense in order to avoid waiver on appeal. *Pinnacle Homes Inc., et al. v. R.C.L. Offshore Engineering*, 640 S.W.2d 629, 630 (Tex.App.—Houston [14th Dist.] 1982, writ ref'd n.r.e.). Where the trial court files findings which do not establish any element of the grounds of defense, the party relying upon that defense must file a request for additional findings such as to avoid waiver of that defense on appeal. *Id.* Appellees contend there was no finding by the trial court on the negligence of Bill Nichols and no additional findings requested by Sears, and since Sears first seven

points of error depend on such a negligence finding, the points of error are waived. Assuming that appellees are correct in their assertion that the first seven points of error do depend on the negligence of Bill Nichols, appellees argument is still without merit.[3]

 The trial court found that Bill Nichols' conduct was not a proximate cause of the injuries to his wife. Proximate causation is an element of negligence. *See Colvin v. Red Steel Co.*, 682 S.W.2d 243, 245 (Tex.1984). Rule 299 states that waiver occurs when there is no finding on any *element* of the asserted defense. Since the trial court made a finding on proximate causation, there was a finding as to an element of the defense of negligence. Therefore, there was no waiver under Rule 299.

In its eighth through eleventh points of error Sears complains of the trial court's admitting evidence on attorney's fees and awarding attorney's fees to the appellees.

In light of the fact that we have held that Sears did not violate the DTPA as a matter of law, there is no basis on which to award attorney's fees to the appellees. TEX.BUS. & COM.CODE ANN. § 17.50(d) (Vernon 1987) (only a consumer who prevails in a DTPA action is entitled to reasonable and necessary attorney's fees).

In their cross-point, appellees assert that they are entitled to damages against Sears for filing a frivolous appeal. *See* TEX. R.APP.P. 84. Rule 84 states that an appellate court may assess damages against a party for bringing an appeal without sufficient cause and for unnecessary delay. In that we have reversed and rendered judgment in favor of Sears, the appeal was obviously brought for sufficient cause and not simply for delay. Appellees' cross-point is overruled.

The trial court erred as a matter of law in concluding that Sears breached the im-

plied warranty to repair in a good and workmanlike manner and was negligent. We reverse the judgment of the trial court and render judgment in favor of appellant Sears and hold that the appellees take nothing.

---

**3.** The arguments made by Sears in points of error one through five are that Sears is not liable under any theory because it followed Bill Nichols' instructions—regardless of whether the instructions were negligent. Therefore, these arguments are not dependent on a finding referring to the negligence of Bill Nichols. Only points of error six and seven depend specifically on the negligence of Bill Nichols.